**SO ORDERED: July 2, 2012.**



**Basil H. Lorch III**
**United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

In re:                                          )
                                                )
PAUL DEAN SIMPSON,                              )          Case No. 08-11224-BHL-7A
                                                )
                    Debtor.                     )
_____ )
                                                )
THOMAS A. KRUDY,                                )
In His Capacity As Chapter 7 Trustee,           )
                                                )
                    Plaintiff,                  )
                                                )
        v.                                      )          Adv. No. 09-50423
                                                )
PAUL DEAN SIMPSON and                           )
LINDA L. SIMPSON,                               )
                                                )
                    Defendants.                 )

### <u>MEMORANDUM DECISION</u>

This matter was initiated by the chapter 7 trustee ("Trustee") on July 28, 2009, and, after the

parties stipulated to the entry of partial summary judgment in open Court on April 3, 2012 [*see* Doc.

59], the remaining four counts of the Trustee's complaint were tried to the Court on May 3, 2012.

Having considered the foregoing, and being otherwise duly and sufficiently advised, the Court, for the reasons set forth herein, enters judgment for the Trustee against Paul Dean Simpson under Counts II and III of the Trustee's complaint, and enters judgment in favor of the Defendants on the remaining counts of the Trustee's complaint.

## Background

As he neared retirement from a long career in the automotive industry, Paul Dean Simpson and his wife, Linda L. Simpson, in April 2002, purchased 37 acres of undeveloped farmland in Wilkinson, Indiana, with the intent of constructing their retirement home and a horse farm on the property. The Simpsons financed the $122,000 purchase with a signature loan from James Deuer, an old friend of Mr. Simpson. The next spring, the Simpsons began construction on what would be Simpson Farms' main barn, aided by a loan to Mr. Simpson from his sister.

Over the following year, the Simpsons made their home on the property, building a modest residence for themselves and state-of-the-art stables for Simpson Farms. They sold their house in Ohio, and repaid Mr. Deuer from the proceeds. Simpson Farms bought, sold, boarded, trained, and conditioned race horses, and sought to specialize in rehabilitation, which it was well equipped to do with a swimming pool for the horses and an air-conditioned barn with music piped in. Mr. Simpson made the important decisions concerning the horse business, which was not incorporated as a legal entity, though Mrs. Simpson helped organize the accounts and with barnyard chores. When he purchased horses, Mr. Simpson titled them in his wife's name, as is customary for men who own race horses, but paid for them with Simpson Farms' funds. The Simpsons maintained separate bank accounts, with Mr. Simpson having exclusive control over Simpson Farms' account (which he also deposited his Social Security benefits into and used to conduct other personal transactions) and Mrs.

2

Simpson having her own personal checking account (into which she deposited her small pension benefits and from which she paid most of the household bills).

Simpson Farms struggled in its first years, recognizing five-figure losses for tax purposes each year, but it steadily grew its revenue.  With the improvements on the property, Mr. Simpson, with his wife's aid, was eventually able to obtain conventional financing for his business.  In August 2006, with the residence and main barn completed, the Simpsons borrowed $175,000 from First National Bank and Trust, secured by a mortgage on the Simpsons' real estate.  Of the loan proceeds, approximately $75,000 went to repay Mr. Simpson's sister; $40,000 went into improvements to the real estate, including two pole barns and some fencing; and the balance funded the ongoing operations of Simpson Farms.

Before long, Simpson Farms required more capital, and Mr. Deuer was there to help.  In January 2007, Mr. Simpson borrowed $275,000 from National City Bank, backed not by a mortgage on the Simpsons' real estate, but only by Mr. Deuer's guarantee and the pledge of Mr. Deuer's brokerage account.  Mrs. Simpson was not a party to the new loan.  As he had with the proceeds of the previous loans from his sister, Deuer, and First National, Mr. Simpson put the borrowed funds into his Simpson Farms bank account.  With the proceeds of the loan from National City, Mr. Simpson repaid the loan from First National, causing the mortgage to be released and leaving the Simpsons' real estate unencumbered.

The balance of the funds did not last long.  Simpson Farms continued to lose money, and on September 12, 2008, about a month after Mr. Deuer died, Mr. Simpson filed for relief under chapter 7 of the Bankruptcy Code with the intent to discharge his liabilities to National City and Mr. Deuer's widow, along with approximately $90,000 in credit card debt.  Mr. Simpson captioned his petition

3

for relief "Paul Dean Simpson dba Simpson Farms." In the papers submitted with the petition, Mr. Simpson disclosed his interest in the real estate, which he valued at $600,000, but claimed a full exemption in the property on the grounds that it was held by he and Mrs. Simpson, who is not in bankruptcy, as tenants by the entireties. *See* 11 U.S.C. § 522(b)(3); Ind. Code §§ 32-17-3-1 and 34-55-10-2(c)(5).

Those initial bankruptcy papers also contained some inaccuracies. On the day Mr. Simpson commenced his bankruptcy case, there were eleven horses boarded at Simpson Farms, five of which were beneficially owned by Mr. Simpson, having been purchased for between $800 and $4,300 apiece; they were later sold for a total of $4,650, less the costs of sale. Too, Simpson Farms, like any going concern, was owed a few thousand dollars by its customers. Mr. Simpson initially failed to disclose his ownership of these assets. Furthermore, in his statement of financial affairs, in the field where gross income is to be disclosed, Mr. Simpson provided only his net losses for the years preceding his bankruptcy. Despite his petition's faults, at the first meeting of creditors, *see* 11 U.S.C. § 341, Mr. Simpson answered the Trustee's questions candidly, though not completely.

Soon thereafter, the Trustee obtained the Court's permission to conduct an examination of Mr. Simpson and his assets pursuant to Fed. R. Bankr. P. 2004. In due course, the Trustee traveled to Wilkinson to tour the Simpsons' property and view Simpson Farms' operations. After seeing the fine facility and getting confused answers from Mr. Simpson, the Trustee, with the Court's approval, engaged an accountant to assist in his investigation. Mrs. Simpson handled most of the Simpsons' financial affairs, so Mr. Simpson naturally gave her his proxy in dealing with the Trustee's accountant. Mrs. Simpson provided the documentation requested by the accountant, disclosed the existence of Simpson Farms' receivables, and otherwise answered his questions as best she could.

4

The Trustee's accountant confirmed that, while Simpson Farms was less than profitable, its ongoing operations generated significant gross income and the facilities where it operated had a value generally consistent with the estimate Mr. Simpson made in his submissions to the Court. Most important, the accountant confirmed the aforementioned series of transactions involving the Simpsons, Mr. Deuer, and the banks. With his investigation complete, the Trustee commenced the instant adversary proceeding.

## Discussion

Four counts were tried to the Court. First, the Trustee seeks a judgment against Mrs. Simpson for contribution of half the amount of the joint loan from First National.[1] By the second and third counts, the Trustee seeks to recover accounts receivable owed to Mr. Simpson and certain personal property he owned when he filed his bankruptcy. Finally, the Trustee seeks the revocation of Mr. Simpson's chapter 7 discharge. Each count is specifically addressed below.

### *Count I: Contribution*

In his pleadings and papers and based on his presentation at trial, the thrust of the Trustee's suit is behind the first count of his complaint, by which he, standing in Mr. Simpson's shoes, *see* 11 U.S.C. §§ 323 and 541(a)(1), alleges that Mrs. Simpson is liable to the bankruptcy estate pursuant to Indiana's doctrine of contribution.[2] Though the general contours of the claim would be

---

[1] Neither party presented evidence of the balance outstanding on the loan from First National when it was repaid. The Trustee has consistently sought a judgment for half the original amount the Simpsons borrowed, which approximation seems reasonable based on the short life of the loan.

[2] Indiana has enacted more specific rights to contribution, which have no application here. *See, e.g.*, *Bourbon Mini-Mart Inc. v. Gast Fuel & Svcs., Inc.*, 783 N.E.2d 253 (Ind. 2003) (pertaining to a statutory action for contribution under the Underground Storage Tank Act, Ind. Code § 13-23-13-8).

5

recognizable to bankruptcy courts that routinely hear preference cases pursuant to 11 U.S.C. § 547,[3]

*see, e.g.*, *Smith v. Tostevin*, 247 F. 102, 103 (2d Cir. 1917) (Hand., J.) (ruling that a "payment to the

creditor discharges [the surety]...precisely as though made directly" to the surety), the Trustee's

action is a creative one; the Court is unaware of any reported bankruptcy cases in which a trustee has

brought an action for contribution against a debtor's spouse.[4]

The common-law right of one who has satisfied a joint obligation to demand contribution

from his co-debtors was recognized by Indiana's courts in the nineteenth century.  *See Cook v. Cook*,

92 Ind. 398, 399 (Ind. 1884) (explaining that the "doctrine of contribution rests on the principle that

where parties stand in equal right, equality of burden becomes equity").  Indiana's Uniform

Commercial Code generally recognizes a right to contribution, but, apart from providing two

affirmative defenses discussed below, defers to coexisting state law for its specifics.  Ind. Code § 26-

1-3.1-116(b) (providing that "a party having joint and several liability who pays the instrument is

entitled to receive from any party having the same joint and several liability contribution in

accordance with applicable law"); *Fleck v. Ragan*, 514 N.E.2d 1287, 1288-89 (Ind. Ct. App. 1987)

("The Indiana Code is silent as to the liability between co-guarantors.  Thus, we must look to the

common law.").[5]  In the absence of further statutory guidance, Indiana's appellate courts have

---

[3] Preference actions against insiders must be premised on a transfer made within one year before the commencement of a bankruptcy case.  11 U.S.C. § 547(b)(4).  In the instant case, the loan from First National was repaid by Mr. Simpson more than one year before he filed for bankruptcy relief, so the Trustee was time-barred from bringing a preference action.

[4] Claims against debtors for contribution are commonplace in bankruptcy and are specifically contemplated by the Bankruptcy Code, which provides standards for their allowance and disallowance.  *See* 11 U.S.C. § 502(e).  In this very case, Mrs. Deuer, whose stock portfolio was liquidated to repay the loan from National City, has such a claim for contribution.

[5] *Fleck*, like most precedents discussed herein, interpreted Indiana's former U.C.C. Article 3, which was repealed and replaced in 1993 with Indiana's enactment of Revised U.C.C. Article 3, P.L.

6

repeatedly revisited contribution doctrine, with three reported decisions involving those who stand in the shoes of spouses.

Indiana's watershed decision on spousal liability for contribution was issued nearly one hundred years ago. *See Magenheimer v. Councilman*, 125 N.E. 77 (Ind. App. 1919). Among the first courts in the nation to address the issue, the *Magenheimer* court held that an estate that paid a note made by the decedent and his widow was entitled to contribution from her for half the expenditure, notwithstanding the note having been secured by a mortgage on real property the couple held as tenants by the entireties. *Id.* The holding was adopted by the majority of states, though a minority position emerged which focused on the nature of a surviving spouse's interest in entireties property.[6] *See McLochlin v. Miller*, 217 N.E.2d 50, 53-54 (Ind. App. 1966) (discussing evolution

---

222-1993, § 5, and codified as Ind. Code Ch. 26-1-3.1. Former Ind. Code § 26-1-3-415 was the predecessor to both Ind. Code §§ 26-1-3.1-116(b) (addressing contribution) and 26-1-3.1-419 (addressing accommodation).

The full text of former Ind. Code § 26-1-3-415 (1992) reads as follows:

Contract of accommodation party.

(1)     An accommodation party is one who signs the instrument in any capacity for the purpose of lending his name to another party to it.

(2)     When the instrument has been taken for value before it is due the accommodation party is liable in the capacity in which he has signed even though the taker knows of the accommodation.

(3)     As against a holder in due course and without notice of the accommodation oral proof of the accommodation is not admissible to give the accommodation party the benefit of discharges dependent on his character as such. In other cases the accommodation character may be shown by oral proof.

(4)     An endorsement which shows that it is not in the claim [chain] of title is notice of its accommodation character.

(5)     An accommodation party is not liable to the party accommodated, and if he pays the instrument has a right of recourse on the instrument against such party.

[6] Courts that espouse the minority position emphasize the collateral being held by the entireties. *See, e.g.*, *Florio v. Greenspan*, 165 N.E.2d 753 (Mass. 1960); *Lopez v. Lopez*, 90 So.2d 456 (Fla. 1956); *Geldart v. Bank of N.Y. & Trust Co.*, 64 N.Y.S.2d 152 (N.Y. App. Div. 1924). As articulated by Indiana's courts, entireties doctrine conceives of a married couple's estate in their residence as "seized

of law and collecting early cases); 76 ALR 2d 1004 (right of surviving spouse to contribution, exoneration, or other reimbursement out of decedent's estate respecting liens on estate by entirety or joint tenancy).

When called upon to overrule *Magenheimer*, the Indiana Court of Appeals has pointedly declined to do so.  Reaffirming *Magenheimer* and the vitality of contribution actions between spouses soon after Indiana's enactment of former Uniform Commercial Code ("U.C.C.") Article 3, *McLochlin* emphasized "that contribution is a right which flows from the debt and it is not affiliated with the security," and plainly stated that "[t]he fact that there is collateral is not consequential." *McLochlin*, 217 N.E.2d at 52.  The court observed that "Indiana law holds generally that… as between [co-makers of a joint and several note] each ordinarily is liable for one-half," *Id.*, and that this rule of common law was unaffected by the adoption of the U.C.C., *Id.* n. 1.  The joint nature of the satisfied obligation controls an action for contribution, while "[a] common interest in the land or property which is used to guarantee or secure the joint debt is not an element that should affect the right of contribution."  *Id.* at 52.  *Magenheimer* and *McLochlin* withstood a later challenge, *see Estate of Leinbach v. Leinbach*, 486 N.E.2d 2, 4 (Ind. Ct. App. 1985) (citing *McLochlin* for the proposition that the "joint and several nature of the obligation gives rise to a right of contribution"), and the Indiana Supreme Court has not addressed the viability of a contribution claim as between spouses.

The Trustee's proposed application of contribution doctrine is dissimilar to any contemplated

---

*per tout*, and not *per my*. Each [spouse], as well as both, is entitled to the use of the whole."  *Chandler v. Cheney*, 37 Ind. 391 (1871).  An entireties estate is succeeded "when a tenant by the entirety dies, [such that] the survivor holds the entire estate, not by virtue of any right which he acquires as survivor, but by virtue of the original grant or devise, *Wallace v. Wallace*, 110 N.E.2d 514, 516 (Ind. App.), *reh'g denied*, 111 N.E.2d 90 (1953).

8

in the opinions of Indiana's appellate courts, and is far afield from the policy considerations that underpinned those rulings, *see, e.g.*, *Leinbach*, 486 N.E.2d at 5 (justifying the application of contribution doctrine between spouses based in part on a belief that "public policy warrants a deference or concern for the interests of a surviving spouse").  Nevertheless, as stated in its order [Doc. 60] denying the Simpsons' motion for summary judgment, the Court concludes that Indiana law permits such an action, and that the Trustee has stated a prima facie case for contribution from Mrs. Simpson.

However, as mentioned above, Indiana's U.C.C. provides two affirmative defenses to an action for contribution based on the plaintiff's satisfaction of a joint obligation embodied in a negotiable instrument.[7]  An action for contribution may lie "[e]xcept as provided in IC 26-1-3.1-419(f) or by agreement of the affected parties."  Ind. Code § 26-1-3.1-116(b).  The second affirmative defense, agreement of the parties, was not raised by Mrs. Simpson and the Court does not consider it herein, though it is tempting to suspect that its existence explains the lack of precedent for an action like this by a bankruptcy trustee.

As to the first statutory affirmative defense, the cross-reference in § 26-1-3.1-116(b) is to another U.C.C. provision, which states that

> [a]n accommodation party who pays the instrument is entitled to reimbursement from the accommodated party and is entitled to enforce the instrument against the accommodated party…[but a]n accommodated party that pays the instrument has no right of recourse against, and is not entitled to contribution from, an accommodation party.

---

[7] Ind. Code Ch. 26-1-3.1, applies only to negotiable instruments.  Ind. Code § 26-1-3.1-102(a); *see Farmers Loan & Trust Co. v. Letsinger*, 652 N.E.2d 63,65 (Ind. 1995).  The Trustee has not challenged the characterization of the First National loan documents as a negotiable instrument or otherwise disputed the applicability of the U.C.C. to the transaction at issue.

Ind. Code § 26-1-3.1-419(f).  An accommodated party, in turn, is defined as one who directly benefits from the consideration given for an instrument, while an accommodation party "signs the instrument for the purpose of incurring liability on the instrument without being a direct beneficiary of the value given for the instrument."  Ind. Code § 26-1-3.1-419(a).[8]  The statute creates a presumption that a signatory of an instrument is an accommodation party "if the signature is an anomalous endorsement or is accompanied by words indicating that the signer is acting as surety or guarantor with respect to the obligation of another party to the instrument," Ind. Code § 26-1-3.1-419(c), but such a qualified signature is not an element of the defense, nor does the statute impose a converse presumption where one signs as a co-maker.[9]

The Indiana Court of Appeals has had multiple occasions to consider who qualifies as an accommodation party.[10]  Interpreting the predecessor to Ind. Code § 26-1-3.1-419 in former U.C.C.

---

[8] The full text of Ind. Code § 26-1-3.1-419(a) reads as follows:

> If an instrument is issued for value given for the benefit of a party to the instrument ("accommodated party") and another party to the instrument ("accommodation party") signs the instrument for the purpose of incurring liability on the instrument without being a direct beneficiary of the value given for the instrument, the instrument is signed by the accommodation party "for accommodation".

[9] Indiana's courts have refused to read such a presumption into the U.C.C.  *See Buchta v. Seng*, 444 N.E.2d 1250, 1252 (Ind. Ct. App. 1983) (holding that "a co-maker of a note can be an accommodation party... [and his] liability to the principal does not affect the relationship between the accommodation party and the party accommodated."); *White v. Household Fin. Corp.*, 302 N.E.2d 828, 399 n. 2 (recognizing "that either primary or secondary parties to a negotiable instrument may be sureties for other parties... without regard to the fact that the surety may have signed as maker, acceptor, drawer, or indorser").  *But cf. In re Flamingo 55, Inc.*, 378 B.R. 893, 909 (Bankr. D. Nev. 2007) ("Under California law, a presumption arises that one who signs a promissory note with others is liable thereunder as a co-maker rather than a surety.")

[10] In addition to being employed as a defense against an action for contribution, the issue has also arisen repeatedly in suits by lenders against obligors, because proving oneself to be an accommodation party is a prerequisite to availing oneself of the surety defenses provided by the U.C.C., such as an assertion that a lender impaired its collateral, *see* Ind. Code § 26-1-3.1-605.  *See, e.g.*, *Letsinger*, 635 N.E.2d 194; *Williams v. Lafayette Prod. Credit Ass'n*, 508 N.E.2d 579 (Ind. Ct. App. 1987); *White v.*

Article 3,[11] Indiana courts ruled that "[w]hether a co-maker is an accommodation party on a promissory note is a question of fact" controlled by "the reason the party signed the instrument." *Farmers Loan & Trust Co. v. Letsinger*, 635 N.E.2d 194, 196 (Ind. Ct. App. 1994), *aff'd and adopted*, 652 N.E.2d 63, 65 (Ind. 1995). Trial courts were to employ a multifactor analysis rather than limit their focus to a particular consideration, such as whether a purported accommodation party directly benefitted from the transaction,[12] *Letsinger*, 635 N.E.2d at 196, or whether the obligor signed the note as a co-maker or explicitly as a guarantor, *White v. Household Fin. Corp.*, 302 N.E.2d 828, 832 n. 2. (Ind. App. 1973). Indiana's precedents written before the enactment of Revised U.C.C. Article 3 emphasize different factors in different cases, as circumstances dictate. *See Letsinger*, 635 N.E.2d at 196-97 (considering whether party directly benefitted, whether lender's internal records characterized party as guarantor, and whether previous borrowings in parties' course of dealing were structured similarly); *Williams v. Lafayette Prod. Credit Ass'n*, 508 N.E.2d 579, 583 (Ind. Ct. App. 1987) (considering direct benefit, evidence of party's intent, and nature of negotiations with lender); *Stockwell v. Bloomfield State Bank*, 367 N.E.2d 42, 45 (Ind. App. 1977) (considering nature of negotiations, course of dealing, and direct benefit), *overruled in part on other grounds*, *Farner v. Farner*, 480 N.E.2d 251 (Ind. Ct. App. 1985); *White*, 302 N.E.2d at 398-99 (considering direct benefit and nature of negotiations).

---

*Household Fin. Corp.*, 302 N.E.2d 828 (Ind. App. 1973).

   [11] See note 5, *supra*.

   [12] The second official comment to U.C.C. § 3-415 indicates that the provision was intended to supersede the preexisting law of some states, which "requir[ed] that the accommodation party sign the instrument 'without receiving value therefor,'" and to establish a flexible standard that allowed an accommodation party to be a "paid surety, or [to] receive other compensation."

11

The statute interpreted in the foregoing cases was, however, amended in 1993.[13]  Codifying some of the case law interpreting its predecessor, the new statute's definition of an accommodation party expressly provides that such an obligor is not a "direct beneficiary of the value given for the instrument," Ind. Code § 26-1-3.1-419(a).  The Indiana Supreme Court has not considered the revised statute, but the Indiana Court of Appeals has.  *See Keesling v. T.E.K. Partners*, 861 N.E.2d 1246 (Ind. Ct. App. 2007).

*Keesling* was an appeal from a judgment for a lender against several co-makers and guarantors of a note.  *Id.* at 1249.  In order to present a common-law surety defense, one of the co-makers asserted that it was an accommodation party.  *Id.* at 1251-52.  Though that company (i) was a co-maker of the note, (ii) was a parent of the company that received and used the funds, and (iii) gave a mortgage on its separate property as security, *Id.* at 1249, the court held that it was an accommodation party, reversing the trial court, *Id.* at 1251-52.  That determination was based on the fact that the company, despite its ownership interest in the company that used the funds, did not itself have a separate interest in the land that its subsidiary acquired with the funds, and so "was not a direct beneficiary of the value given for the instrument."[14]  *Id.* at 1252.

---

[13] See note6, *supra*.

[14] The *Keesling* court's characterization of the benefit to the parent company as being "indirect" and consistent with accommodation status tracks the first official comment of Revised U.C.C. § 3-419, which offers the following helpful example:

> [I]f X cosigns a note of Corporation that is given for a loan to Corporation, X is an accommodation party if no part of the loan was paid to X or for X's direct benefit. This is true even though X may receive indirect benefit from the loan because X is employed by Corporation or is a stockholder of Corporation, or even if X is the sole stockholder so long as Corporation and X are recognized as separate entities.

In support of its articulation of the statutory standard, the *Keesling* court cited only *Yin v. Soc'y Nat'l Bank Ind.*, 665 N.E.2d 58 (Ind. Ct. App. 1996), a case that considered only the former U.C.C., *viz.* Ind. Code § 26-1-3-415, before determining that the U.C.C. did not apply and that accommodation status was accordingly controlled by common law, *see Yin*, 655 N.E.2d at 62-63. *Keesling*, 861 N.E.2d at 1252. For its part, *Yin* was based on U.C.C. cases like *Letsinger*, *Williams*, and *White*, which it quoted with approval. *See Yin*, 655 N.E.2d at 63-64.

Based on the favorable citation of *Yin* in *Keesling*, the Court concludes that the previously discussed Indiana cases on former Ind. Code § 26-1-3-415 are still good law. Though the statute has been significantly reworked and now specifies that the receipt of a direct benefit is a dispositive consideration, a fair reading of Ind. Code § 26-1-3.1-419(a) still allows for the sort of inquiry based on the totality of the circumstances that Indiana's courts have long engaged in when called upon to determine accommodation status. Other courts have similarly interpreted the Revised U.C.C. to be entirely consistent with case law under the former U.C.C. *See, e.g.*, *In re Robinson Bros. Drilling*, 9 F.3d 871, 874 (10th Cir. 1993); *Citibank (Ariz.) v. Van Velzer*, 982 P.2d 833, 835 (Ariz. Ct. App. 1998); *but see In re Flamingo 55, Inc.*, 378 B.R. 893, 910 (Bankr. D. Nev. 2007) (confining the inquiry to whether the party was a direct beneficiary of the instrument, and determining, *contra Keesling*, that a subsidiary's use of borrowed funds constitutes a direct benefit to its parent).

Turning at last to the case at hand, the Court preliminarily observes that the question of Mrs. Simpson's status would be an easy one if Simpson Farms had been incorporated and the farm was not also the Simpsons' residence. In that event, even if Mrs. Simpson was a shareholder or partner, the question of her status as an accommodation party would be directly controlled by *Keesling*, since the benefit that would have accrued to her from the business's use of the proceeds of the loan from

13

First National would have been indirect within the meaning of Ind. Code § 26-1-3.1-419(a), just as the benefit to a parent company from its subsidiary's use of borrowed funds is indirect. *See Keesling*, 861 N.E.2d at 1252.

The actual facts of the case at bar present a closer call. Simpson Farms is a proprietorship owned by Mr. Simpson; Mrs. Simpson is not a partner. This conclusion is controlled by Indiana law, which defines a partnership as "an association of two or more persons to carry on as co-owners of a business for profit." Ind. Code § 23-4-1-6(1). As this Court has previously observed, Indiana's appellate courts have construed Indiana's Uniform Partnership Act, Ind. Code § 23-4-1-1 *et seq.*,

> to require proof that the alleged partners (1) joined together to carry a trade for their common benefit, (2) each contributed property or services, (3) each had an interest in the profits, (4) formed a "contract of association for the purpose of sharing profits and losses," and (5) had an intention to form a partnership. *Copenhaver v. Lister*, 852 N.E.2d 50, 58-59 (Ind. Ct. App. 2006).
>
> When applying the statutory factors to spouses, Indiana courts have required a heightened showing, since "cotenancy of property and the sharing of losses and profits of a business... are consistent with the usual marital arrangement." *Soley v. VanKeppel*, 656 N.E.2d 508, 513 (Ind. Ct. App. 1995).

*Murphy Oil USA, Inc. v. Baker (In re Baker)*, Adv. Pro. No. 09-59029, 2011 WL 4549172 at *10-11 (Bankr. S.D. Ind. 2011). The Trustee has not met his burden under Indiana law to prove that Mrs. Simpson was a partner in Simpson Farms, having demonstrated only that she provided occasional assistance with chores and paperwork and derived some sentimental satisfaction from being listed as the nominal owner of mediocre entrants in horse races. Accordingly, Mrs. Simpson cannot be said to have benefitted directly from the portion of the proceeds of the loan from First National that was used to cover Simpson Farms' operating losses.

The only portion of the proceeds of the loan from First National that Mrs. Simpson might be

14

said to have benefitted directly from is the $40,000 that was used to construct utility barns and fencing on the Simpsons' marital property. No evidence was presented of the impact that these improvements had on the value of the Simpsons' real estate, and the Court will not infer that the impact was commensurate with the expenditure. The utility barns and fencing presumably made the property better suited for use as a commercial stable, and this, it is reasonable to surmise, probably boosted the farm's value by some amount. However, the utility barns and fencing were built to suit the needs of Mr. Simpsons's business, not with the intention of increasing the value of the Simpsons' real estate. Mrs. Simpson, the evidence showed, not only had no control over the funds but had no idea what, specifically, her husband intended to do with them. Any benefit to her was indirect within the meaning of Ind. Code § 26-1-3.1-419(a) and *Keesling*.

Other factors support the conclusion that Mrs. Simpson was an accommodation party to the loan from First National. First, the loan from First National was the first in the history of Mr. Simpson's borrowings to fund Simpson Farms in which Mrs. Simpson participated. Mr. Simpson borrowed first from family and friends, and then, when that was no longer feasible, sought conventional financing and arranged whatever security the banks required to lend. In this light, Mrs. Simpson's participation seems clearly to have been an accommodation to Simpson Farms' voracious appetite for money. Second, it is reasonable to infer from the evidence that First National would not have made the loan without the mortgage, which Mr. Simpson could not have granted on his own because the real estate was held by the entireties. Third, there was no evidence that the Simpsons intended that Mrs. Simpson bear half the burden of the loan from First National. Her pension benefits could not have serviced half the loan, and the Simpsons were clearly unaware of the specter of contribution doctrine until the Trustee filed this suit.

15

Based on the foregoing, the Court concludes that the Trustee's claim for contribution fails because Mrs. Simpson was an accommodation party.

### *Count II: Turnover of the Proceeds of Accounts Receivable*

By the second count of his complaint, the Trustee alleges that Mr. Simpson had an interest in accounts receivable owed to Simpson Farms when he commenced his bankruptcy case, and, pursuant to 11 U.S.C. §§ 541 and 542, seeks, "a judgment against the defendant Paul Dean Simpson for the turn over of all accounts receivable due and owing to him on the date of his bankruptcy filing." Presumably, Mr. Simpson has either collected or written off any debts owed to Simpson Farms in 2008 in the ordinary course of business during the last three and a half years, so the Court construes the Trustee's complaint to seek the liquidation of and judgment for the value of such receivables when the case was filed.

After this adversary proceeding was filed, Mr. Simpson, on August 11, 2011, amended his schedules in his underlying bankruptcy case to disclose his interest in such receivables [*see* Doc. 68 therein]. The line item does not identify the customers with outstanding bills or provide any detail other than that on the day he filed for bankruptcy protection, Mr. Simpson was owed $3,681.25 for the boarding and rehabilitation of horses. No evidence was presented at trial to dispute that figure. Accordingly, Mr. Simpson is liable to the Trustee under Count II of the complaint in the amount of $3,681.25.

### *Count III: Turnover of the Proceeds of Horses*

As pleaded, Count III of the Trustee's complaint, which "seeks the issuance of a judgment that provides for the turn over of the assets of the horse breeding business," would encompass the receivables and subsume Count II. For good reason (i.e. because Simpson Farms is a sole

proprietorship that has no independent existence apart from Mr. Simpson*)*, the Trustee did not present such a broad case at trial. Rather, apart from the receivables, the Trustee focused on Mr. Simpson's interest in five horses that were titled in his wife's name despite Mr. Simpson's paying for them, training them, racing them, and otherwise exclusively directing their use. Though he did not disclose his interest in the horses at the outset of his bankruptcy case as he should have, Mr. Simpson has conceded that he was the true beneficial owner of the horses.

Mr. Simpson's amended Schedule B indicates the prices paid for the horses, but asserts their value on the date the bankruptcy commenced to be "unknown." At trial, however, Mrs. Simpson testified convincingly about the specific sale price of each horse. The total price paid for the horses, which were all sold during the pendency of Mr. Simpson's bankruptcy in the ordinary course of business, was $4,650. The Trustee presented no evidence to dispute this figure. Testimony further indicated that Mr. Simpson did not realize the full amount of the above figure, since the auctioneer's fee and other transaction costs were paid from the proceeds. However, Mr. Simpson presented no evidence of what such costs were, and the Court is not inclined to speculate in his favor. Accordingly, Mr. Simpson is liable to the Trustee under Count II of the complaint in the amount of $4,650.

### *Count V: Denial of Discharge*

By Count V of his complaint, the Trustee seeks the revocation of the Mr. Simpson's discharge pursuant to 11 U.S.C. § 727(d). However, because the Trustee filed the instant adversary proceeding timely pursuant to Fed. R. Bankr. P. 4004(a) and 9006, no discharge order has been entered in Mr. Simpson's underlying bankruptcy case. *See* Fed. R. Bankr. P. 4004(c)(1)(B). Rather, the Court construes the Trustee's complaint as seeking the denial of discharge pursuant to 11 U.S.C.

17

§ 727(a). The Trustee's allegations correspond closely to the substance of paragraphs (2), (3), (4), and (6) of that subsection. Accordingly, the Court is to prohibit Mr. Simpson from receiving a discharge if it finds by a preponderance of the evidence, *see In re Scott*, 172 F.3d 959 (7th Cir.1991), that he fraudulently concealed property or records from his creditors or the Trustee, or fraudulently made a false account in connection with his bankruptcy proceedings, or that he refused to answer fully the questions and requests for production by the Trustee and the professionals he hired to investigate and prosecute this case.

Mr. Simpson's disclosures left much to be desired. Based on the record in his underlying bankruptcy case, Mr. Simpson did not amend his schedules to reflect his interest in the receivables and horses until more than two years into the proceedings. Mr. Simpson also failed to disclose Simpson Farms' gross receipts in his original statement of financial affairs, providing only the net losses for the relevant periods. However, the evidence showed that he made such disclosures to the Trustee and his accountant during the course of the first meeting of creditors and the Trustee's examination pursuant to Fed. R. Bankr. P. 2004, and that he and Mrs. Simpson otherwise conducted themselves in good faith and were responsive to the Trustee's queries and requests. Some delay and confusion is understandable in the context of a small-business case like Mr. Simpson's, and is not always indicative of the sort of bad faith or intent to obfuscate that § 727(a) contemplates. The Trustee failed to introduce any evidence from which the Court could infer fraudulent intent. This is not an instance of a financially sophisticated debtor who intentionally maintained inadequate records, *see Union Planters Bank v. Connors*, 283 F.3d 896 (7th Cir. 2002), or a debtor's disclosures being so confused as to require the trustee to speculate in reconstructing the debtor's financial affairs, *see In re Juzwiak*, 89 F.3d 424 (7th Cir. 1996). Mr. Simpson's delay in amending his schedules, in

18

light of the fact that he appropriately complied with the Trustee's investigation, hardly merits denial of discharge, the ultimate sanction in bankruptcy. Accordingly, the Court enters judgment in favor of Mr. Simpson under Count V of the Trustee's complaint.

### Conclusion

Based on the foregoing, the Court enters judgment as follows. Under Count I of the Trustee's complaint, the Court finds in favor of Linda L. Simpson; she is in no way liable to the Trustee based on this adversary proceeding. Under Counts II and III, the Trustee is awarded a judgment against Paul Dean Simpson in the total amount of $8,331.25.[15] The Court will entertain a motion by the Trustee to revoke the Debtor's discharge in the main case if the judgment is not paid. Under Count V, the Court finds in favor of Mr. Simpson, and orders that he be granted his discharge pursuant to 11 U.S.C. § 727 in his underlying bankruptcy case in due course.

IT IS SO ORDERED.

###

---

[15] As to Counts II and III, the identical issue has also been presented by the Trustee in Mr. Simpson's underlying bankruptcy case. Therein, the Trustee recently filed a motion for turnover, seeking the same relief requested under Count II of his adversary complaint, along with the turnover of other assets allegedly in Mr. Simpson's possession. That motion will be granted concurrently by separate order for the reasons set forth herein and in a manner consistent with this judgment.

19